UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Libertarian Party of New Hampshire**

   **v.**                                                  Civil No. 14-cv-00322-PB
                                                                     Opinion No. 2014 DNH 266

**William M. Gardner, Secretary of
State of the State of New Hampshire,
in his official capacity**


**MEMORANDUM AND ORDER**

    Third parties in New Hampshire can have their candidates placed on a statewide general election ballot by obtaining the requisite number of nomination papers from registered voters in this State.  In July 2014, the General Court amended this procedure to require that all nomination papers be signed in the same year as the general election.  In this action, the Libertarian Party of New Hampshire seeks to invalidate the same-year restriction as a violation of the First and Fourteenth Amendments.  The New Hampshire Secretary of State has moved to dismiss the Libertarian Party's complaint for failure to state a claim.  For the reasons that follow, I deny the Secretary's motion.

I.  **BACKGROUND**

A political organization can have its nominees placed on the New Hampshire general election ballot in either of two ways. First, the organization can attain state-recognized "party" status by receiving at least four percent of the vote for either Governor or U.S. Senator in the most recent general election. N.H. Rev. Stat. Ann. § 652:11. Historically, however, that method has proven useful only to the two main political parties. Third parties generally resort instead to the second method, in which an organization can gather and submit the "requisite number of nomination papers" in the manner prescribed by sections 655:40-a and 655:42, III of the New Hampshire Revised Statutes. N.H. Rev. Stat. Ann. §§ 655:40-a, 655:42, III. Under this method, the organization must submit nomination papers signed by "registered voters equaling 3 percent of the total votes cast at the previous state general election." N.H. Rev. Stat. Ann. § 655:42, III. Nomination petitions must be submitted to municipal officials of the town or ward where the petition signer is registered to vote no later than the Wednesday five weeks before the primary election. N.H. Rev. Stat. Ann. § 655:41. Local officials must then verify that petition signers are registered to vote and certify their

results no later than two weeks before the primary.[1]  Id.  Because the New Hampshire primary falls on the second Tuesday of September, this requirement effectively imposes an early-August deadline for an organization to obtain and submit its nomination papers for verification.  See N.H. Rev. Stat. Ann. § 653:8.

In July 2014, the New Hampshire General Court amended § 655:40-a to require that "[n]omination papers shall be signed and dated in the year of the election."  N.H. Rev. Stat. Ann. § 655:40-a.  In other words, nomination papers that are signed before January 1 of an election year no longer count toward the required number of signatures that a political organization must obtain before it can run a slate of candidates in that year's election.  See id.  A political organization that seeks to place its candidates on the statewide ballot under the second option, therefore, must now collect the requisite number of signatures within a time window of roughly seven months, beginning on January 1 and ending in early August.  See id.

---

[1] New Hampshire holds a "state primary election" on even numbered years to nominate candidates for federal, state, and local office.  See N.H. Rev. Stat. Ann. § 652:5.  It also holds a "Presidential Primary Election every four years to select delegates to the national party conventions."  See N.H. Rev. Stat. Ann. § 652:6.  All references to the "primary" in this Memorandum and Order refer to the state primary elections.

It is this same-year requirement for nomination papers that the Libertarian Party challenges in this action. The Party describes itself as "the most active and well known third party" in New Hampshire. Doc. No. 1 at 7. Although not as prominent as the two main political parties in this State, the Party "has run candidates in New Hampshire for more than four decades" and "was particularly active during the 2000 and 2012 general elections." Id. at 7-8. In those years, the Party explains, it placed its nominees on the ballot by submitting the requisite number of nomination petitions. The requirements in those years, however, did not include the same-year restriction, which the General Court did not enact until 2014. Had the same-year restriction existed in 2000 and 2012, the Party maintains, it "would likely not have been able to obtain the necessary nomination papers to get on the ballot." Id. at 9.

In this action, the Libertarian Party contends that the same-year restriction imposed by the 2014 amendment to § 655:40-a is unconstitutional because it "places substantial burdens" on the Party's ability to field candidates and compete in future elections. See id. at 1-2. The Party claims that two separate burdens flow from the restriction. First, it alleges, the same-year requirement unreasonably "compresse[s]" the time available for it to collect the signatures required under the nomination

4

papers process.  See id. at 2.  To meet the threshold for placing its candidates on the statewide ballot in 2016, the Party expects to need almost 15,000 nomination papers.[2]  Under the same-year requirement, however, the Party must wait until January 1 to begin collecting those signatures.  See id. at 10.  Beyond obtaining the signatures themselves, the Party points to other administrative tasks required by the State that it must complete before the August deadline, such as sorting nomination papers by municipality and dropping the papers off at the appropriate office within each municipality.  See id. at 9-10; N.H. Rev. Stat. Ann. § 655:41, I.  Being allowed only seven months to collect and administer that large number of signatures, the Party claims, jeopardizes its ability to participate in the election.  See Doc. No. 1 at 9-10.

Even if it manages to obtain enough nomination papers within that seven-month window, the Libertarian Party further claims, the same-year requirement will also prevent it from

---

[2] The complaint provides 13,600 as a hypothetical figure, approximately three percent of total voters in the 2010 New Hampshire off-year election.  See Doc. No. 1 at 10 n. 3.  In fact, 495,453 people voted in the November 2014 New Hampshire off-year election, three percent of which will require 14,864 nomination papers for the 2016 general election.  See "Ballots Cast and Names on Checklist – 2014 General Election," New Hampshire Secretary of State Website (available at http://sos.nh.gov/Elections/Election_Information/2014_Elections/General_Election/Ballots_Cast_and_Names_on_Checklist_-_2014_General_Election.aspx).

"effectively participat[ing] in and contribut[ing] to the statewide election during both the odd-numbered year prior to the general election, as well as the year of the general election itself."  Id. at 2.  The Party contends that the months leading to a general election are critical for "recruiting, fundraising, and electioneering."  See id. at 2-3.  Without the same-year requirement, the Party claims, it would be able to obtain the requisite signatures during the off-year before a general election and focus on these important tasks during the "crucial time period preceding" the general election.  See id. at 2.  The Party claims, however, that the same-year requirement will force it to focus on gathering nomination papers during that important time instead of fundraising and electioneering, impairing its ability to compete in the general election.  See id. at 2-3.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if it pleads "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In deciding a motion to dismiss, I employ a two-step approach. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (citations, internal quotation marks, and alterations omitted). A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed. Id. Second, I credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then determine if the claim is plausible. Id. The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

7

### III.  ANALYSIS

Ballot access restrictions implicate two separate, but related, constitutional rights under the First and Fourteenth Amendments: first, "the right of individuals to associate for the advancement of political beliefs," and second, "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968).  These rights extend to the formation of political parties.  Norman v. Reed, 502 U.S. 279, 288 (1992).  "[V]oters can assert their preferences only through candidates or parties or both . . . The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." Anderson v. Celebrezze, 460 U.S. 780, 787 (1983) (internal quotations and citations omitted).

At the same time, states have a strong interest in conducting orderly elections.  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974).  Therefore, although every ballot access regulation "inevitably affects" the rights of voting and association, "the state's important regulatory interests [in

8

conducting orderly elections] are generally sufficient to justify reasonable, nondiscriminatory restrictions." Anderson, 460 U.S. at 788.

To balance these competing interests, "the Supreme Court has developed a flexible sliding scale approach for assessing the constitutionality of [ballot access] restrictions.  Under this approach, when the burden imposed by a ballot access regulation is heavy, the provision must be narrowly tailored to promote a compelling state interest.  Reasonable, nondiscriminatory restrictions, however, need be justified only by legitimate regulatory interests." Barr v. Galvin, 626 F.3d 99, 109 (1st Cir. 2010) (citing Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)) (internal citations and quotations omitted).  The outcome of this analysis depends heavily on the challenged restriction's factual context.  "In passing judgment, [a court] must not only determine the legitimacy and strength of [the state's] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Anderson, 460 U.S. at 789.

The Libertarian Party is entitled to proceed with its case under the fact-dependent framework that the Supreme Court has formulated for ballot access claims. With no factual record before me, I cannot predict whether the Party will be able to prove its claim that the law it challenges imposes a heavy burden on its ability to participate in the election process. Nor can I predict whether the State will succeed in articulating and justifying its interests in the restriction if it is called on to do so. Which standard of review will ultimately apply, and whether either party will ultimately meet its burden under the appropriate standard, are "sufficiently open question[s] that [I] cannot conclude, on the pleadings, that no set of facts exists under which [the Party] might prevail." Cruz v. Melecio, 204 F.3d 14, 22 (1st Cir. 2000). As the First Circuit has made clear, where a ballot-access complaint alleges facts that could trigger heightened scrutiny, "[t]he fact-specific nature of the relevant inquiry obviates a resolution . . . on the basis of the complaint alone." Id. (internal citation omitted). That result controls here.

The State offers a number of arguments in favor of dismissal, but none are persuasive. First, the State observes, probably correctly, that the amended § 655:40-a is nondiscriminatory. See Doc. No. 9-1 at 6. To avoid heightened

10

scrutiny, however, a challenged ballot access restriction must be both nondiscriminatory and reasonable. Anderson, 460 U.S. at 788; Barr, 626 F.3d at 109. Even a facially nondiscriminatory restriction can still encounter heightened scrutiny if shown to be unreasonable or unduly burdensome. See Cruz, 204 F.3d at 22 (ballot access claim could trigger heightened scrutiny even where challenged restriction was nondiscriminatory). Even if § 655:40-a were found facially nondiscriminatory, therefore, the State would not be entitled to dismissal at this stage on that basis alone.

Next, and reaching the central question in this motion, the State attempts to show that the Libertarian Party's claim cannot trigger heightened scrutiny because the same-year restriction is reasonable as a matter of law. See Doc. No. 9-1 at 6-7. In making this argument, however, the State addresses only the Party's objection to the "compressed" schedule introduced by the amended § 655:40-a and not to the conflict between that schedule and the prime electioneering period preceding a general election. See id. But in any event, I am not equipped to grant dismissal even of the Party's "compressed" timeframe argument at this stage. To be sure, some of the cases that the State cites, in which various courts have upheld signature submission periods of similar lengths, may eventually counsel in favor of the

restriction's validity.  The Supreme Court has emphasized, however, that analysis of ballot access restrictions is factually driven and case-specific, not bound by "any litmus-paper test that will separate valid from invalid restrictions." Anderson, 460 U.S. at 789 (internal quotation omitted).  Thus, whether the nomination papers process under the amended § 655:40-a is reasonable depends not only on the number of signatures the State requires and the amount of time the State allows to collect them, but also on a multitude of other factors that are not yet visible on this record.  See id.  Under the "fact-specific nature of the relevant inquiry," therefore, I am not prepared to conclude as a matter of law either that the Party's claim is entitled only to rational basis review or that dismissal would be appropriate at this point.  See Cruz, 204 F.3d at 22.

The State's remaining arguments attempt to bolster its justification for the amended § 655:40-a.  As I have explained, however, I cannot evaluate the strength of the State's justification at this stage solely on the face of the complaint. See Cruz, 204 F.3d at 22.

## IV.  CONCLUSION

For these reasons, I deny the State's motion to dismiss the

Party's complaint (Doc. No. 9).

    SO ORDERED.

                                        /s/Paul Barbadoro
                                        Paul Barbadoro
                                        United States District Judge

December 30, 2014

cc:   Courtney Hart, Esq.
      William E. Christie, Esq.
      Gilles R. Bissonnette, Esq.
      Laura E. B. Lombardi, Esq.
      Stephen G. LaBonte, Esq.