**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Libertarian Party of**
**New Hampshire**

    **v.**

**William M. Gardner,**
**Secretary of State of**
**the State of New Hampshire,**
**in his official capacity**

Case No. 14-cv-322-PB
Opinion No. 2015 DNH 164 P


**MEMORANDUM AND ORDER**


Political organizations can gain access to the New
Hampshire general-election ballot either by receiving at least
four percent of the total votes cast for Governor or U.S.
Senator in the preceding election or by submitting nomination
papers signed by enough of the State's registered voters to
equal at least three percent of the total votes cast in the
prior election.  In 2014, the New Hampshire state legislature
amended the State's ballot-access laws to require nomination
papers to be signed during the same year as the general
election.  In this action, the Libertarian Party of New
Hampshire ("LPNH") contends that the new same-year requirement
is an impermissible ballot-access restriction that violates the

First and Fourteenth Amendments to the United States
Constitution.

## I.   <u>BACKGROUND</u>[1]

### A.   <u>The Same-Year Nomination Papers Requirement</u>

Candidates for political office in New Hampshire typically
gain access to the general-election ballot by winning their
party's primary election.[2]  Only political organizations that
qualify as "political parties" under New Hampshire law, however,
hold primaries.  To qualify as a "political party," a political
organization must receive at least four percent of the total
votes cast for Governor or U.S. Senator in the preceding
election.  N.H. Rev. Stat. Ann. § 652:11.  Rather than
participate in the primary process, other political
organizations that seek to place their candidates on the

---

[1] The facts summarized in this section are undisputed.  I draw
them from both the summary judgment record and evidence and
testimony taken during an evidentiary hearing that I held in
this action on July 13, 2015.  Evidence admitted during that
hearing is cited in this Memorandum and Order as either "Def.'s
Ex." Or "Pl.'s Ex."  Summary judgment exhibits are cited by
their docket number.

[2] New Hampshire also allows individual candidates to run
unaffiliated with any political organization by submitting a
specified number of nomination papers.  See N.H. Rev. Stat. Ann.
§§ 655:40, 655:42, III.

general-election ballot - which I will call "third parties" for the sake of convenience - must submit enough nomination papers signed by New Hampshire registered voters to equal three percent of the total votes cast in the prior general election.  See N.H. Rev. Stat. Ann. §§ 655:40-a, 655:42, III.  A registered voter may sign only one valid nomination paper during each election cycle.  N.H. Rev. Stat. Ann. § 655:40-a.

To qualify for the general-election ballot, third parties must submit the requisite number of nomination papers to local election officials in the towns or wards where each signer is registered to vote no later than the Wednesday five weeks before the primary.  N.H. Rev. Stat. Ann. § 655:41, I.  Local officials must then certify the validity of all nomination papers no later than two weeks before the primary.  Id.  Because the New Hampshire primary falls on the second Tuesday in September, this requirement effectively establishes an early August deadline for the submission of nomination papers.  See N.H. Rev. Stat. Ann. §§ 653:8, 655:41, I.

In July 2014, the New Hampshire legislature passed House Bill 1542 ("HB 1542"), which amended Section 655:40-a to provide that "[n]omination papers shall be signed and dated in the year of the election."  N.H. Rev. Stat. Ann. § 655:40-a (emphasis

3

added).  Because nomination papers must be filed by August, the
new law requires third parties that seek to access the general-
election ballot to collect the requisite number of nomination
papers within a window of roughly seven months, extending from
January 1 until early August of the election year itself.  See
N.H. Rev. Stat. Ann. §§ 653:8, 655:40-a.

The record contains few details that explain why the
legislature passed HB 1542.  When the House Election Law
Committee referred the bill to the full House, it explained:

> This bill was requested by the Secretary of State.  It
> requires that nominating petitions for a political
> organization seeking placement on the ballot for the
> state general election shall be signed and dated in
> the year of the election, beginning January 1 of the
> political cycle.  This will reduce the number of
> invalid signatures, due to death or relocation, which
> might arise if signatures are submitted earlier.

Doc. No. 37-3 at 13.

Representative Melanie Levesque, one of the bill's
sponsors, observed before the bill's passage:

> When a third party attempts to collect nominating
> papers, they normally would start right after the
> general election.  This would lead to signatures that
> could be two years old, and very difficult to verify.
> Collecting these papers in the same year of the
> election facilitates verification, although limiting
> the time in which to collect signatures.

Id. at 20 (minutes summarizing testimony).

4

After this litigation began, LPNH submitted interrogatories to the State that requested, among other things, a "descri[ption of] all state interests that [the State] claim[s] HB 1542 advances."  Id. at 62.  In response, the State said:

> In order to obtain ballot status a political organization should be able to show some reasonable level of support to justify the increased and significant cost of printing ballots and the additional complexity added to the ballot design impacting the voters [sic] ability to read and understand the ballot.  The time frame for collecting signatures in the current statute makes it less likely that the supervisors of the checklist will be asked to review petitions where the signatory has either passed away, moved, or has otherwise been disqualified.

Id.

## B.    LPNH

The Libertarian Party is a prominent third party in the United States.  Describing its philosophy as "live and let live," it favors a limited government that respects "the right of each person . . . to engage in any activity that is peaceful and honest."  Doc. No. 36-1 at 6-7.  LPNH constitutes the national Libertarian Party's institutional presence in New Hampshire.  It claims that it "has a demonstrated history of engaging in political activity in New Hampshire and is, by far, the most active and well known third party in the state."  Id. at 7.

5

LPNH, however, has struggled recently to garner widespread
support in New Hampshire.  Richard Tomasso, the current state
chairman of LPNH, estimates that only about 150 New Hampshire
residents are registered members of the national Libertarian
Party, and fewer than that are registered members of LPNH
itself.  See Doc. No. 37-6 at 4 (Tomasso Dep. at 9:7 – 11:6).
Only about twelve people attended LPNH's last party convention
in March 2015.  Id. (Tomasso Dep. at 11:22 – 12:1).  LPNH
identifies no current member of the New Hampshire legislature as
one of its members.  Id. (Tomasso Dep. at 18:21 – 19:7).

LPNH last qualified for ballot access in New Hampshire as a
formal political party in 1996, when the threshold required to
avoid the nomination papers requirement stood at three rather
than four percent of votes cast in the previous general
election.  Since then, it has qualified for ballot access under
the nomination papers process twice, in 2000 and again in 2012.

Based on voter turnout in the 2010 general election,
qualifying for ballot access in 2012 by nomination papers
required third parties to collect 13,843 valid signatures.[3]  But

---

[3] The record contains much less information about the 2000
ballot-access drive, and the parties emphasize the 2012 drive as
the principal example of LPNH's experience in meeting the
nomination papers requirement.  Therefore, I focus here on the

because some signers inevitably prove to be ineligible, rendering the nomination papers that they sign invalid, any organization that runs a petition[4] drive must collect a larger number of unverified, or "raw," signatures to ensure that it will obtain enough valid signatures.  For this reason, LPNH sought to collect approximately 19,000 total signatures during the 2012 drive, which assumed a seventy-five percent petition validity rate.

LPNH began its 2012 petition drive in late July 2011 after the Libertarian National Committee (the "LNC"), the governing board of the national Libertarian Party, agreed to give $28,000 to LPNH to support its drive.  LPNH spent those funds on paid professional petitioners because, it explains, "paid support – including professional petitioners – is a necessity in conducting a successful petition drive of this magnitude."[5]  Doc.

---

2012 drive and not on the 2000 drive.  I note, however, that the 2000 drive appears to have been similar to the 2012 drive in most material respects: LPNH began its drive early, in mid-1999, and finished only "a couple weeks before" the August 2000 deadline.  See Doc. No. 37-8 at 7.

[4] The term "petitions" is often used as shorthand for "nomination papers" in this context, including by the parties to this action.

[5] The record suggests that paid petitioners are often more effective than volunteers for several reasons, including

No. 37-8 at 6.  LPNH gathered 13,787 raw signatures between
August 1 and September 23 of 2011, the vast majority of which
were collected by the paid petitioners, who charged anywhere
from $1 to $2 per signature during that period.  In other words,
LPNH gathered nearly seventy percent of the raw signatures it
sought to collect within a 77-day period, largely relying on
funds it received from the LNC.

        After September 23, 2011, the initial $28,000 infusion from
the LNC ran out.  LPNH lacked its own funds to hire paid
petitioners on any significant scale, so it aimed instead to
finish the petition drive by relying on volunteers supplemented
by any paid petitioners that it could afford with its limited
resources.  But this strategy met with limited success.
Although the intervening months between September 2011 and the
August 2012 deadline offered at least two promising
opportunities for petition collection – the Presidential primary
in January 2012, and town elections in March 2012 – LPNH
struggled to recruit even a handful of volunteers to collect
petitions on either occasion.  See Doc. No. 37-6 at 30 (Tomasso
Dep. at 115:12-13) (explaining that LPNH "manage[d] to get a

---

financial motivation and professional experience.

couple people out for" the January Presidential primary); Def.'s
Ex. Z (March 2012 email from Tomasso reporting that LPNH "had
very poor turnout for help on town election day").

Between roughly September 2011 and late July 2012, LPNH
collected only about 5,000 additional raw nomination papers.  As
the early August deadline loomed, the LNC decided to allocate an
additional $4,000 to LPNH to hire paid petitioners and finish
the drive.  This final effort succeeded, and LPNH submitted its
last nomination papers for verification just before the August
2012 deadline.

All told, LPNH spent roughly $40,000 of its own and the
LNC's funds on the 2012 petition drive, although LPNH contends
that this figure does not reflect certain out-of-pocket
expenses.  Most of these funds were spent on professional
petitioners, who charged anywhere from $1 to $3 per signature
for their services at various times during the drive.  Although
some of the paid petitioners charged more per petition as the
deadline approached and the demand for their services rose, at
least one paid petitioner continued to charge only $1 per
signature as late as April 2012.  See Doc. No. 37-6 at 21
(Tomasso Dep. at 78:15 - 79:7).

Based on voter turnout in the 2014 midterm elections, LPNH

9

will need to submit approximately 14,800 valid nomination papers
to qualify for the 2016 general-election ballot.  Assuming a
validity rate of seventy-five percent, therefore, it will likely
need approximately 20,000 total unverified nomination papers to
meet the requirement.  LPNH estimates that funding a paid
petition drive for the 2016 election will cost roughly $50,000.
Doc. No. 36-1 at 31.  This figure is higher than the $40,000
cost of the 2012 drive, LPNH asserts, because the January 1
start date will limit petition collection to the election year
itself, when paid petitioners charge more for their services.

## C.   Procedural History of This Action

LPNH brought this action against William Gardner, the New
Hampshire Secretary of State, in July 2014 shortly after the
General Court passed HB 1542.  It seeks a declaration that the
same-year requirement prescribed by HB 1542 is unconstitutional
and an order enjoining the State from enforcing it.  Doc. No. 1
at 16-17.  The parties proceeded through an expedited discovery
schedule and submitted cross-motions for summary judgment.[6]  I

---

[6] In April 2015, the Republican National Committee (the "RNC")
moved to intervene as defendants in this case.  See Doc. No. 30.
For reasons that I explained on the record during an April 20,
2015 hearing, I denied the RNC's request to intervene as
defendants but permitted it to participate as an amicus curiae.

held a hearing for oral argument on the cross-motions on June
18, 2015.  The parties have stipulated that I can resolve their
dispute at the summary judgment stage.[7]

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and [that] the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  The evidence submitted in support of the motion must be
considered in the light most favorable to the nonmoving party,
drawing all reasonable inferences in its favor.  See Navarro v.
Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the
absence of any genuine dispute of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one
'that might affect the outcome of the suit under the governing

---

[7] Although the parties agreed that this case could be resolved on
cross-motions for summary judgment, I held an evidentiary
hearing on July 13, 2015 to address LPNH's factual claim that
the State's petitioning process was already burdensome even
before HB 1542's adoption.  Having heard the evidence that bears
on this claim, I am satisfied that there is no genuine dispute
as to any material facts that would prevent me from resolving
this case on cross-motions for summary judgment.

law.'"  United States v. One Parcel of Real Prop. with Bldgs.,
960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party
satisfies this burden, the nonmoving party must then "produce
evidence on which a reasonable finder of fact, under the
appropriate proof burden, could base a verdict for it; if that
party cannot produce such evidence, the motion must be granted."
Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st
Cir. 1996); see Celotex, 477 U.S. at 323.

On cross motions for summary judgment, the standard of
review is applied to each motion separately.  See Am. Home
Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812
(1st Cir. 2006) (applying the standard to each motion where
cross motions were filed); see also Mandel v. Bos. Phoenix,
Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-
motions for summary judgment neither dilutes nor distorts this
standard of review.").  Hence, I must determine "whether either
of the parties deserves judgment as a matter of law on facts
that are not disputed."  Adria Int'l Group, Inc. v. Ferré Dev.,
Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III.   __ANALYSIS__

Ballot-access restrictions implicate two separate, but related, constitutional rights that derive from the First and Fourteenth Amendments: "the right of individuals to associate for the advancement of political beliefs," and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968). These rights extend to the formation of political parties because "voters can assert their preferences only through candidates or parties or both. . . . The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." Anderson v. Celebrezze, 460 U.S. 780, 787 (1983) (internal quotation omitted).

At the same time, states have a strong interest in conducting orderly elections. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974). Thus, although every ballot-access regulation "inevitably affects" the rights of effective voting and

13

association, "the state's important regulatory interests [in
conducting orderly elections] are generally sufficient to
justify reasonable, nondiscriminatory restrictions." Anderson,
460 U.S. at 788.  "This legitimate interest in reasonable
regulation is based not only on 'common sense,' Burdick v.
Takushi, 504 U.S. 428, [433 (1992)], but also on the
[Constitution's] Article I reservation to the States of the
power to prescribe 'Times, Places and Manner of holding
Elections for Senators and Representatives.'  U.S. Const., Art.
I, § 4, cl. 1." Libertarian Party of Me. v. Diamond, 992 F.2d
365, 370 (1st Cir. 1993).

     To balance these competing interests, "the Supreme Court
has developed a flexible sliding scale approach for assessing
the constitutionality of [ballot-access] restrictions." Barr v.
Galvin, 626 F.3d 99, 109 (1st Cir. 2010) (internal quotation
omitted).  In its pathmarking ballot-access decision in Anderson
v. Celebrezze, the Supreme Court explained how courts should
apply this approach to determine the validity of challenged
ballot-access restrictions:

        [A court] must first consider the character and
        magnitude of the asserted injury to the rights
        protected by the First and Fourteenth Amendments that
        the plaintiff seeks to vindicate.  It then must
        identify and evaluate the precise interests put

                              14

> forward by the State as justifications for the burden
> imposed by its rule. . . . Only after weighing all
> these factors is the reviewing court in a position to
> decide whether the challenged provision is
> unconstitutional.

460 U.S. at 789.  Under Anderson and its progeny, a restriction

that imposes a "severe" burden on ballot access cannot survive

unless it is "narrowly drawn to advance a state interest of

compelling importance." Burdick, 504 U.S. at 434 (internal

quotation omitted); see also Timmons v. Twin Cities Area New

Party, 520 U.S. 351, 358 (1997); Barr, 626 F.3d at 109.  In

contrast, restrictions that impose reasonable and

nondiscriminatory burdens on ballot access require only a

"corresponding [state] interest sufficiently weighty to justify

the limitation." Norman v. Reed, 502 U.S. 279, 288-89 (1992);

see Anderson, 460 U.S. at 788.  The outcome of this analysis

depends heavily on the challenged restriction's factual context.

See Anderson, 460 U.S. at 789 ("The results of this evaluation

will not be automatic; as we have recognized, there is 'no

substitute for the hard judgments that must be made.'") (quoting

Storer, 415 U.S. at 730)).

Following Anderson and its progeny, therefore, I first

consider whether HB 1542 imposes a severe burden on ballot

access.  After determining that the law instead imposes only a

15

reasonable and nondiscriminatory burden on LPNH's ability to access the ballot, I then identify the state interests that HB 1542 serves and conclude that those interests are sufficient to sustain the law against LPNH's challenge.

**A.   Burden Imposed by HB 1542**

To establish its claim that HB 1542 imposes a severe burden on ballot access, LPNH first contends that its experiences during its 2000 and 2012 petition drives demonstrate that the State's petitioning process was already onerous before the same-year requirement was introduced.  LPNH then argues that HB 1542 elevates this already-arduous burden into a severe one because it: (1) impermissibly shortens the time during which nomination papers may be collected; (2) improperly places the petitioning window squarely within the prime campaigning season that precedes the general election; and (3) forces third parties to "sit on the sidelines" during the year before the general election.  I begin by addressing each of these asserted burdens individually.  I then consider whether the nomination papers process viewed as a whole, including HB 1542, imposes a severe burden on third-party ballot access.

1.   Compression of the Petition Collection Window

LPNH first objects to HB 1542 because, on its face, the law

16

shortens the collection window for nomination papers from 21 months to seven months.  In LPNH's view, a seven-month petition-collection period is too short, especially considering that the period encompasses the winter months when, in its view, it is practically impossible to collect nomination papers.

Both the Supreme Court and the First Circuit, however, have repeatedly upheld petition requirements comparable to HB 1542 in both the number of petitions required and the length of time allowed to collect them.  These precedents effectively foreclose any argument that the petitioning window provided by HB 1542 is too short on its face.  In Jenness v. Fortson, for instance, the Supreme Court upheld Georgia's policy requiring third parties to collect petitions from five percent of all eligible voters over 180 days.  403 U.S. 431, 433, 438 (1971).  The Court also upheld a much shorter petitioning period in American Party of Texas v. White, where the challenged Texas policy required third parties to collect petitions numbering one percent of actual votes cast in the last election – which, at the time, entailed 22,000 petitions – within 55 days.  415 U.S. 767, 783, 786 (1974).  Similarly, in Storer v. Brown, the Court observed that, "[s]tanding alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden," although it remanded

17

that case for further factual development.  415 U.S. 724, 740 (1974).  And in Barr v. Galvin, citing American Party of Texas, the First Circuit characterized a Massachusetts requirement to collect 10,000 signatures within 60 days as "modest" rather than severe.  626 F.3d 99, 110 (1st Cir. 2010); see also Stone v. Bd. of Election Comm'rs, 750 F.3d 678, 684 (7th Cir. 2014) ("Ninety days does not strike us as an excessively short time to collect 12,500 signatures . . . .  We previously saw no problem with a ninety-day window to collect 25,000 signatures.") (citing Nader v. Keith, 385 F.3d 729, 736 (7th Cir. 2004)).

I recognize that the analysis of ballot-access restrictions is not bound by any "'litmus-paper test' that will separate valid from invalid restrictions," Anderson, 460 U.S. at 789, based solely on percentage thresholds and time limits.  But these cases, although not dispositive, provide a consistent and useful set of benchmarks with which to evaluate the burden imposed by a shortened petition-collection window.  See Norman, 502 U.S. at 295 (using Jenness five percent threshold as benchmark in evaluating Illinois ballot restriction); Munro v. Socialist Workers Party, 479 U.S. 189, 193-94 (1986) (citing Jenness and American Party of Texas as benchmarks in ballot-access cases).  Taken together, these cases demonstrate that the

18

time allowed by HB 1542 on its face for petition collection is objectively reasonable, and LPNH cites no persuasive case to the contrary.

Instead, and reminding this Court of Anderson's fact-specific framework, LPNH argues that two unique characteristics particular to New Hampshire distinguish this case and render the petition-collection window prescribed by HB 1542 a severe burden on ballot access.  First, LPNH maintains that New Hampshire's harsh winters preclude signature collection during the winter months, shortening the petitioning period even beyond what HB 1542 allows on its face.  I am unpersuaded by this argument. Although snowstorms and bitter cold undoubtedly limit the ability of third parties to gather signatures on certain winter days, LPNH's own experience during its 2012 petition drive establishes that it is not impossible to collect petitions at all during the winter.  See Doc. No. 37-20 at 24 (LPNH petitioning spreadsheet showing that LPNH collected over 1,000 signatures in December 2011).  Moreover, even if adverse weather sometimes hinders petition collection during the winter, LPNH can use that time to advance its petition drive in other ways that do not require prolonged outdoor exposure, such as fundraising and volunteer recruitment.  Finally, even if New

19

Hampshire winter did practically shorten the petitioning window to five months, as LPNH maintains, that five-month period would still fall within the benchmarks upheld by the Supreme Court and the First Circuit.  Winter in New Hampshire, therefore, neither distinguishes the HB 1542 petition-collection window from binding precedent nor imposes a severe burden on ballot access.

LPNH also argues that the shortened petition-collection window bars it from collecting signatures at certain prominent New Hampshire public events that take place during the fall before an election year.  Although this observation is true as far as it goes, it does not establish any severe burden imposed by the shortened petitioning period.  County fairs and certain city elections, which occur in the fall, may well provide promising opportunities for signature collection, but numerous public events that are equally promising still take place during the new petitioning period.  For instance, third parties can collect signatures at local public gatherings within the new petitioning period like town meetings, which occur in the spring, and local farmers markets, which occur in the spring and summer.  In Presidential election years, the Presidential primary, which takes place in January, offers third parties

another opportunity to ask registered voters for signatures.[8]

These examples demonstrate that ample opportunity remains for

third parties to collect signatures at public events within the

petitioning period set by HB 1542.  Beyond this, New Hampshire

has no constitutional obligation to allow third parties to

collect signatures at every public event that occurs in this

State, however removed in time from the general election.  The

exclusion of fall public events from the new petitioning window,

therefore, does not distinguish HB 1542 from Supreme Court and

First Circuit benchmarks or otherwise constitute a severe burden

on third-party ballot access.

    2.   <u>Conflict Between Petitioning and Campaigning</u>

    LPNH next argues that HB 1542 imposes a severe burden on

its ability to access the ballot because it places the

petitioning period squarely within the campaign season preceding

---

[8] LPNH itself recognized the 2012 Presidential primary as a
lucrative opportunity to collect signatures.  Ultimately,
however, LPNH was unable to capitalize on that opportunity,
largely because many of its prospective volunteers chose to
volunteer for Ron Paul's campaign instead.  <u>See</u> July 13, 2015
Evid. Hr'g Tr., Doc. No. 52 at 2 (Tomasso testifying that LPNH
was "competing [with the Ron Paul campaign] for a lot of the
same mind share and people who shared our political beliefs."),
3 (Tomasso testifying that LPNH could not muster volunteers to
collect signatures at polling places on Presidential primary
election day in January 2012 because "a lot of them were working
for the Ron Paul campaign.").

the general election.  That placement, LPNH argues, imposes a severe burden because it forces third parties to focus exclusively on petitioning during a period that they would otherwise devote to campaigning, placing them at an unfair disadvantage compared to the major parties.  But for several reasons, this new burden, although not trivial, is also not severe.

First, even assuming, as LPNH claims, that third parties cannot begin campaigning until they complete the petitioning process, the petitioning window that HB 1542 prescribes still leaves a significant amount of time available for general electioneering.  Because the petitioning deadline falls in early August, political organizations that qualify for ballot access still have the entire period between the deadline and Election Day in early November to focus solely on campaigning, a period that includes all of September and October.  As Rich Tomasso, LPNH's state chair, testified during his deposition, "the time immediately prior to the election is the most important time for campaigning."  Doc. No. 37-6 at 8 (Tomasso Dep. at 26:6-8).  HB 1542 does nothing to restrict third parties that qualify for ballot access from campaigning during this period.

22

Beyond this, however, I do not accept LPNH's underlying premise that campaigning cannot begin until the petitioning requirement is fulfilled.  For one thing, the record does not support LPNH's position.  Instead, it suggests that petitioning, although perhaps not fully equivalent to campaigning, still offers third parties and their prospective candidates an opportunity to interact with the public and promote their views. In a March 2012 email to solicit volunteers to collect petitions at town elections, for instance, Tomasso wrote, "If you want to run for office as a Libertarian, [town election day] is a great time to meet your voters and do some early campaigning."  Def.'s Ex. V at LPNH-1052.  An August 2000 LPNH newsletter comments that the petitioning process, which allows "thousands of voters . . . to meet Libertarian candidates and activists," provides the party "an effective outreach tool."  Doc. No. 37-14 at 2. Moreover, the record also suggests that LPNH conducted at least some campaign activities during its 2012 petition drive before it had finished the petitioning process.  LPNH itself concedes that it "did . . . have some candidates engage in campaigning prior to completing the petitioning drive" in 2012.  Doc. No. 36-1 at 14.  And John Babiarz, LPNH's former state chair and 2012 gubernatorial candidate, testified during his deposition

23

that he "had to focus [himself] on campaigning" rather than
petitioning during that year's drive.  Doc. No. 37-7 at 25
(Babiarz Dep. at 93:22).  The record, in short, does not
substantiate LPNH's assertion that the petitioning requirement
forecloses campaigning until it is fulfilled.

LPNH offers an additional argument against the election-
year petitioning window beyond its own claimed inability to
campaign during that period.  It maintains that the putative
conflict between the petitioning period and campaigning season
places third parties at an unfair disadvantage compared to the
major parties.  In effect, LPNH argues that the January 1 start
date forces third parties to complete administrative busywork at
a time during the election year when the major parties can
direct their full attention to campaigning.

This argument overlooks the fact that the major parties
must meet their own ballot-access requirement during the
election year by holding primaries.  New Hampshire holds its
primary election on the second Tuesday of September in every
election year, five weeks after the petition submission deadline
and two weeks after the deadline for local officials to certify
those petitions.  N.H. Rev. Stat. Ann. §§ 653:8, 655:41, I.
During election years, therefore, major-party candidates enjoy

24

no free pass to focus solely on the general election while third parties are trying to gather petitions.  Instead, they must first compete in and win their party primaries, a process that does not end until well <u>after</u> the petitioning process concludes. The burden of a primary may differ qualitatively from that of a petitioning requirement, but it remains that major-party candidates face their own preliminary obstacle to the general-election ballot during the election year.[9]  As the Supreme Court has explained, "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." Jenness, 403 U.S. at 441. "Equality of opportunity exists [here], and equality of opportunity – not equality of outcomes – is the linchpin of what the Constitution requires . . . ." Werme v. Merrill, 84 F.3d

---

[9] During oral argument, LPNH suggested that comparing the petitioning process to the primary system is like "conflating apples and oranges," June 18, 2015 Arg. Tr., Doc. No. 51 at 4, because the Republican and Democratic Parties already know that their candidates will appear on the ballot even if they do not yet know who those candidates will be.  But even if the major parties are guaranteed to have their candidates placed on the general election ballot, the primary still forces them to expend time, money, and effort during the election year on an endeavor other than the general election itself.

479, 485 (1st Cir. 1996).

For these reasons, the placement of the petitioning window within the election year is both reasonable and nondiscriminatory.  I do not doubt that LPNH would rather spend its time and resources during an election year on campaigning instead of petitioning.  But the same could be said of any political party, including the major parties, which would likely prefer to avoid the sometimes factious primary process and instead select their candidates and begin campaigning for the general election before September of the election year.  The challenge that political parties of all sizes face to manage multiple tasks at once, even in an election year – to both walk and chew gum, so to speak – is a simple and essential fact of American political life, not cause for heightened constitutional scrutiny.  See Am. Party of Tex., 415 U.S. at 782-83.  That HB 1542 requires third parties to collect nomination papers during the election year, therefore, imposes no severe burden on third-party ballot access in this State.

   3.   Compelled Idleness During the Off Year

Finally, LPNH argues that HB 1542 imposes a severe burden on ballot access because it "forces [LPNH] to 'sit on the sidelines' for the entire odd-numbered year before the general

election year."  Doc. No. 36-1 at 29.  So far as it goes, it is
true that HB 1542 precludes LPNH from collecting nomination
papers during the off year.  But it simply does not follow that
the law completely "bar[s LPNH] from engaging in petitioning
during the odd numbered year," id. at 29-30, as LPNH contends.
Even with the January 1 start date in place, LPNH remains free
to plan its election-year petition drive and recruit volunteers
during the off year.  More importantly, because paid petitioners
are central to any petition drive, LPNH also remains free to
raise funds for the drive during the off year that it can then
spend on paid petitioning during the election year.  LPNH's "sit
on the sidelines" argument, therefore, articulates a burden that
is minor at best and not severe in any event.

    4.  Collective Evaluation

    As I have explained, none of these three grounds for LPNH's
opposition to HB 1542 individually constitutes a severe burden
on ballot access.  The critical question, however, is whether
the various burdens that HB 1542 imposes collectively cause the
law as a whole to rise to that threshold.  See Storer, 415 U.S.
at 738-39.

    Either characterizing or quantifying the aggregate burden
that a ballot-access restriction imposes is a somewhat arbitrary

task.  Ultimately, however – and as LPNH acknowledges – all
petitioning requirements demand either a certain number of
volunteer hours or a certain amount of money to pay professional
petitioners to replace those volunteers.  See Am. Party of Tex.,
415 U.S. at 787 ("Hard work and sacrifice by dedicated
volunteers are the lifeblood of any political organization.");
Doc. No. 36-1 at 24 ("Without paid support, a petition drive
cannot get off the ground because the Libertarian Party
structure is not a large organization.").  Certain qualitative
characteristics of a ballot-access restriction might seem to
evade easy quantification, but they still translate into either
dollar amounts or the equivalent number of volunteer hours.  The
winter months, for instance, might make it more difficult for
petitioners to collect signatures in public places during cold
spells, increasing either the number of volunteer hours or the
number of paid petitioners that will be required to gather
petitions during those periods.  Likewise, placing the
petitioning window within an election year might require more
funds because some paid petitioners might charge more during an
election year than during an off year.  For purposes of broadly
estimating the burden imposed by HB 1542, therefore, it is fair
to express that collective burden in rough dollar terms.

28

LPNH tacitly acknowledges this approach by stipulating that a successful petitioning drive in 2016 will cost $50,000, assuming that HB 1542 remains in force.  See Doc. No. 37-6 at 26 (Tomasso Dep. at 97:14-16).  As I have explained, I view that stated cost as an aggregate evaluation of the various burdens that flow from HB 1542.  Although this stipulated burden is certainly not trivial, I cannot conclude that it qualifies as severe.  In comparative terms, it is not dramatically more onerous than the $40,000 cost of the 2012 petition drive.  See Doc. No. 36-1 at 25.  Nor does it qualify as severe in its own right.  The Republican 2012 gubernatorial nominee in New Hampshire spent over $1 million on that year's primary election alone, or around 20 times what LPNH expects its 2016 petitioning drive to cost.[10]  For better or worse, in modern political terms, $50,000 is a relatively small amount of money.  And even if raising that amount will prove infeasible for LPNH, the party remains free to collect nomination papers for free by recruiting and organizing sufficient volunteers.

---

[10] See "Statement of Receipts and Expenditures for Political Committees for Friends of Ovide 2012 Committee," Sept. 19, 2012 (available at New Hampshire Secretary of State website, http://sos.nh.gov/20120919comm.aspx?id=26519).

For these reasons, I conclude that HB 1542 imposes only a reasonable and nondiscriminatory, and not a severe, burden on ballot access.

## B.    Sufficiency of the State Interest

Because HB 1542 does not impose a severe burden on ballot access, strict scrutiny does not apply.  See Burdick v. Takushi, 504 U.S. 428, 434, 439 (1992).  The parties disagree about which level of scrutiny should control in light of this conclusion. Citing the New Hampshire Supreme Court's decision in Guare v. New Hampshire, --- A.3d ---, No. 2014-558, 2015 WL 2340003 (N.H. Apr. 22, 2015), LPNH argues that even if strict scrutiny does not apply, intermediate scrutiny is nonetheless appropriate. The State argues otherwise, citing the First Circuit's decision in Barr v. Galvin, 626 F.3d 99 (1st Cir. 1999), to contend that rational-basis review should control.

I disagree with both positions, although I acknowledge that this disagreement may be little more than semantic.  As the First Circuit explained in Barr, the Supreme Court's ballot-access cases establish a "'sliding scale' approach for assessing the constitutionality" of ballot-access restrictions.  626 F.3d at 109.  Under this approach, the strength of the interest that the state must demonstrate to justify a restriction rises or

falls depending on how burdensome the restriction is.  See
Burdick, 504 U.S. at 434 (citing Anderson v. Celebrezze, 460
U.S. 780, 789 (1983)).  It is true that severe ballot-access
restrictions, which occupy the most onerous extreme on this
continuum, call for strict-scrutiny review requiring the
challenged restriction to "be narrowly tailored [to] advance a
compelling state interest." Timmons v. Twin Cities Area New
Party, 520 U.S. 351, 358 (1997); see also Norman v. Reed, 502
U.S. 279, 288-89 (1992).  But the Supreme Court has never
designated any specific lesser level of scrutiny – whether
rational basis, intermediate scrutiny, or any other standard of
review – to analyze restrictions that do not impose severe
burdens.  Instead, in Burdick v. Taskushi, the Court applied
Anderson balancing, rather than a discrete level of scrutiny, to
a ballot-access restriction that it found to be not severe.  See
504 U.S. at 434, 439-40 (holding that the "legitimate interests
asserted by the State are sufficient to outweigh the limited
burden" that the restriction under review imposed); see also
Timmons, 520 U.S. at 363-64 (applying Norman "sufficiently
weighty" standard to non-severe restriction).  And in Crawford
v. Marion County Election Board, 553 U.S. 181 (2008), a majority
of the Court's members appeared to disavow the application of

specific and discrete levels of scrutiny to non-severe restrictions.  See 553 U.S. at 191 (Stevens, J.) ("However slight th[e] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'") (quoting Norman, 502 U.S. at 288-89), 210 (Souter, J., dissenting) (observing that Court has "avoided preset levels of scrutiny in favor of a sliding-scale balancing analysis").

Thus, I decline to apply any specific and discrete level of scrutiny to HB 1542 and instead evaluate the State's interest supporting the law under the Anderson balancing framework.[11]  To do so, I must consider the "precise interests put forward by the

---

[11] I recognize that the First Circuit applied rational-basis review to the law at issue in Barr.  626 F.3d at 110.  I read that decision, however, to apply rational basis-review because the burden imposed by the challenged law was so minor that it did not warrant review of any greater rigor.  See id.  The First Circuit also applied rational-basis review in Werme v. Merrill, a pre-Barr decision, but it made this reasoning more explicit. See 84 F.3d at 485 ("Given the character and magnitude (or, more aptly put, lack of magnitude) of the alleged injury to the plaintiffs' First and Fourteenth Amendment rights, we conclude that the defendants need only show that the enactment of the regulation had a rational basis.")  As I have explained, HB 1542 creates a burden that, although not severe, is more than trivial.  Thus, under Anderson analysis, it requires a more searching review than mere rational-basis scrutiny to verify that the State's interest is "sufficiently weighty to justify the limitation," Norman, 502 U.S. at 288-89.

State as justifications for the burden imposed by" HB 1542, Anderson, 460 U.S. at 789, and determine whether those interests are "sufficiently weighty to justify the limitation," Norman, 502 U.S. at 289. I may only consider interests that the State identifies; I am not free, in other words, to validate the restriction based on hypothetical interests that the State does not invoke. Cool Moose Party v. Rhode Island, 183 F.3d 80, 88 (1st Cir. 1999).

The State offers several justifications for HB 1542 to meet its burden under Anderson balancing. Its strongest argument, however, appeals to its interest in maintaining an orderly ballot by requiring candidates to demonstrate a measure of public support before gaining ballot access.[12] The State

---

[12] The State also points to two other interests that, it argues, provide sufficient justification for HB 1542: first, avoiding confusion with the statutory provision for unaffiliated candidates to gain ballot access by collecting their own nomination papers, which had already been subject to a January 1 start date; and second, reducing the number of "false positives," or nomination papers accepted toward the requirement that were actually invalid because their signers had either relocated or died before the early August deadline for petition submission. I need not address these other interests, however, because the State's interest in requiring a demonstration of sufficient support independently justifies HB 1542. For that reason, Block v. Mollis, which involved a challenge against a Rhode Island ballot-access restriction similar to HB 1542, does not bear on this case, since Rhode Island sought to justify the challenged restriction there solely on the basis of the state's

explains that HB 1542 "require[s] a political organization to obtain the requisite number of nomination papers within a set time frame, thereby showing that the organization currently has the necessary level of popular support within New Hampshire" to gain ballot access.  Doc. No. 41-1 at 22-23.  This purpose, the State argues, comports with its broader interest in avoiding ballot clutter and overcrowding by limiting ballot access only to those organizations that demonstrate a basic level of support within New Hampshire.  Id. at 22-23.

The State's asserted justification finds powerful and extensive support in both Supreme Court and First Circuit precedents, which establish that the State's broad regulatory interest in administering orderly elections includes a strong interest in avoiding ballot clutter. See Anderson, 460 U.S. at 788; Libertarian Party of Me. v. Diamond, 992 F.2d 365, 371 (1st Cir. 1993).  "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic

---

claimed "false positive" interest.  See 618 F. Supp. 2d at 151-52 (D.R.I. 2009).

process at the general election." Jenness v. Fortson, 403 U.S. 431, 442 (1971).  "The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not." Lubin v. Panish, 415 U.S. 709, 715 (1974); see also Am. Party of Tex. v. White, 415 U.S. 767, 782 (1974) (describing state's interest in requiring political organizations to "demonstrate a significant, measurable quantum of community support" as "vital"); Libertarian Party of Me., 992 F.2d at 371 (observing that support requirement "is meant to safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies").

The State's strong and well-established interest in preventing ballot clutter by requiring political organizations to "make a preliminary showing of substantial support," Anderson, 460 U.S. at 788 n.9, provides sufficient justification for HB 1542.  The law ensures that third parties placing candidates on the general-election ballot first obtain expressions of support from a relatively small but measurable number of New Hampshire voters within the election year itself. In other words, it requires third parties to garner not only "a

preliminary showing of substantial support," id., but a showing
of support that will remain reasonably current and relevant at
the time of the election itself.[13]  Measuring the scale and
currentness of community support through this process may not be
"a completely precise or satisfactory barometer of actual
community support for a political party, but the Constitution
has never required the States to do the impossible." Am. Party
of Tex., 415 U.S. at 786-87.  As I have explained, the burden

---

[13] At oral argument and in its reply brief, LPNH suggested that
the State's currentness argument renders HB 1542 facially
discriminatory because New Hampshire accepts older election
results as a sufficient showing of support from the major
parties, which qualify for ballot access by receiving at least
four percent of the vote for either Governor or U.S. Senator in
the previous general election.  See N.H. Rev. Stat. Ann. §
652:11.  It is unconstitutional, LPNH contends, to demand same-
year nomination papers from third parties to demonstrate the
currentness of their support while also accepting the results of
an election held two years earlier as a sufficient showing of
support for the major parties.  But the major parties, of
course, must obtain at least four percent of votes cast at the
previous general election to avoid the nomination papers
requirement, while third parties need only collect nomination
papers totaling three percent of that turnout.  See N.H. Rev.
Stat. Ann. §§ 652:11, 655:42, III.  This one-percent difference
is a legitimate legislative approximation of potential erosion
of support during the year following an election.
Alternatively, the legislature could also reasonably conclude
that actually casting a vote for a candidate at an election
demonstrates more enduring support than signing a nomination
paper.  In sum, this difference between major-party and third-
party ballot-access qualification does not render HB 1542
facially discriminatory.

that HB 1542 imposes, although not negligible, is reasonable and nondiscriminatory.  At bottom, it demands nothing more than a fair approximation of the threshold political support that the State is entitled to require of political parties that seek ballot access.  Weighing the reasonableness of the restriction created by HB 1542 against the gravity of the State's asserted interest underlying the law, I conclude that the State's strong interest in "insist[ing] that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support," id. at 782, outweighs the burden that HB 1542 imposes on third parties.

LPNH concedes, as it must, that the State has at least an abstract interest in avoiding ballot clutter.  See Doc. No. 36-1 at 47.  For two reasons, however, it argues that HB 1542 does not legitimately advance that interest.[14]  First, LPNH objects

---

[14] LPNH also protests that the State raised its interest in requiring a demonstration of sufficient and current support too late in this litigation for me to credit it.  I agree that the State primarily relied on other asserted interests during the early stages of this litigation, although I note that it at least alluded to the ballot clutter interest in its responses to LPNH's interrogatories.  See Doc. No. 37-3 at 62 ("In order to obtain ballot status a political organization should be able to show some reasonable level of support to justify the increased and significant cost of printing ballots and the additional complexity added to the ballot design impacting the voters [sic] ability to read and understand the ballot.").  Nevertheless,

that the preliminary-support justification for HB 1542 is a <u>post</u>
<u>hoc</u> rationalization rather than the legislature's actual
motivation for the law.  If LPNH were correct in claiming that
HB 1542 is subject to strict scrutiny, this argument might wield
some force.  But <u>Anderson</u> balancing, not heightened scrutiny,
controls this analysis, and the Supreme Court's cases applying
<u>Anderson</u> balancing have not barred states from invoking
interests that either find scant support in the legislative
history or otherwise look like <u>post</u> <u>hoc</u> justifications rather
than actual motivations.  In <u>Crawford</u>, for instance, the
plaintiffs argued that the state's asserted interests justifying
the challenged restriction were invalid because the restriction
"was actually motivated by partisan concerns."  553 U.S. at 191.
The Court considered those asserted interests under <u>Anderson</u>
analysis nonetheless because they were "unquestionably relevant
to the State's interest in protecting the integrity and
reliability of the electoral process."  <u>Id.</u>[15]; <u>see also</u> <u>Tashijan</u>

_____

both the State and the RNC fully briefed the sufficient support
interest in their summary judgment submissions, and LPNH had a
full opportunity to respond to this argument in its reply brief
and at oral argument.

[15] Justice Scalia's concurrence in the judgment accepted the lead
opinion's articulation of these state interests.  <u>See</u> <u>Crawford</u>,
553 U.S. at 209.

v. Republican Party of Conn., 479 U.S. 208, 217-25 (1986)

(considering multiple interests asserted by state without

inquiring into whether those interests were actual or post hoc).

Here, too, it is enough that HB 1542 furthers the State's

undisputed interest in preventing ballot clutter.[16]

---

[16] LPNH claims in passing that HB 1542 represents an "intentional
effort to discriminate against the Libertarian Party."  Doc. No
36-1 at 9 (capitalization modified).  If, of course, the record
supported this claim – if, for instance, direct evidence showed
that members of either the General Court or either of the major
parties intended HB 1542 to stifle LPNH or any other third party
– then legislative motivation would be highly consequential.
The record, however, contains no such evidence.  To support its
intentional discrimination claim, LPNH recounts how, before the
2012 LPNH petition drive began in summer 2011, Secretary Gardner
initially believed that third-party nomination papers needed to
be signed during the election year.  See id.  But after LPNH
explained to him that the same-year restriction applied only to
individual candidates and not to third parties under New
Hampshire law at that time, he relented and told LPNH that the
State would accept nomination papers signed in either 2011 or
2012.  Id. at 10.  After the 2012 election, however, in December
2013, Secretary Gardner's office endorsed the passage of HB
1542, which extended the same-year requirement to third parties.
Id.  LPNH points to no other evidence supporting its intentional
discrimination claim.

I can discern no basis on which this account could support a
reasonable inference of intentional discrimination against LPNH,
and LPNH's brief provides no such explanation beyond merely
recounting these facts.  See id. at 9-10.  More broadly, beyond
its conclusory and undeveloped assertion at oral argument that
the record as a whole suggests intentional discrimination
against it, LPNH has offered no other sufficient basis for its
intentional discrimination claim – nor could it, given the lack
of any supporting evidence in the record.  Thus, I treat LPNH's
intentional discrimination claim as a nullity for purposes of

LPNH also argues that HB 1542 does not advance the State's interest in preventing ballot clutter because "[t]he regime before HB 1542" – namely, the existing three percent threshold unaccompanied by any same-year requirement – "already served this state interest."  Doc. No. 43 at 16.  Logically, however, this argument implies that states cannot modify their ballot-access regulations until actual voter confusion or distracting frivolous candidacies occur, a position that the Supreme Court rejected in Munro v. Socialist Workers Party, 479 U.S. 189 (1986).  "To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions," the Court held there, "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action."  Id. at 195.  For that reason, the Court's ballot-access doctrine permits state legislatures "to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."

---

summary judgment.

Id. at 195-96.  Thus, the relevant question here is whether the challenged restriction is itself reasonable and sufficiently justified by a regulatory interest, not, as LPNH suggests, whether the existing regulations preceding the restriction were already effective.  As I have explained, HB 1542 imposes only a reasonable burden on ballot access that is outweighed by the State's interest in avoiding ballot clutter.  Under Munro, that conclusion ends the matter, and the State need not make an additional factual showing of actual ballot overcrowding or voter confusion predating HB 1542 for the law to survive.  See id.

## IV.  CONCLUSION

This case requires me to decide only whether HB 1542 violates the First and Fourteenth Amendments to the U.S. Constitution.  For the reasons I have explained, I conclude that it does not.

Reasonable minds can and do disagree about the wisdom of this country's present two-party political structure, and there is little question that, for better or worse, HB 1542 promotes that structure to at least some degree by making it marginally more difficult for third parties to gain ballot access in New

41

Hampshire.  But because HB 1542 does not breach any of the
constitutional ballot-access boundaries that the Supreme Court
has established, it is for the New Hampshire legislature to
decide whether the law serves the interests of this State's
voters.

HB 1542 prescribes a reasonable and nondiscriminatory
ballot-access restriction that is justified by the State's
interest in requiring political parties to demonstrate a
sufficient level of support within the State.  It is therefore
not unconstitutional.  Thus, I deny LPNH's motion for summary
judgment (Doc. No. 36) and grant the Secretary's motion for
summary judgment (Doc. No. 40).  The clerk shall enter judgment
accordingly and close the case.

SO ORDERED.


                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge
August 27, 2015


cc:  Courtney Hart, Esq.
     William E. Christie, Esq.
     Gilles R. Bissonnette, Esq.
     Laura E. B. Lombardi, Esq.
     Stephen G. LaBonte, Esq.
     Brian D. Duffy, Esq.
     Gordon J. MacDonald, Esq.

42